WHISSEN v. FURTH.

Opinion delivered December 24, 1904.

1. LIQUORS—RIGHT TO REMONSTRATE AGAINST LICENSE—APPEAL.—Any citizen has a right to appear in the county court and remonstrate against the issuance of a dramshop license to an applicant, on the ground that the applicant is not a person "of good moral character," as required by Sandels & Hill's Digest, section 4869, and to appeal from an adverse decision. (Page 369.)

2. SAME—BURDEN OF PROOF AS TO APPLICANT'S QUALIFICATIONS.—Under Sandels & Hill's Digest, section 4869, providing that it shall be lawful to grant licenses to sell liquors to persons "of good moral character," the burden is upon the applicant to show that he possesses the character required by the statute. (Page 369.)

3. SAME—CHARACTER OF DRAMSHOP KEEPER.—An applicant for saloon license who is shown to be an habitual violator of the law against gambling, running a gambling house in connection with his saloon, is not a person "of good moral character," within the meaning of the statute, however honest he may be in ordinary business matters or clean in private life. (Page 370.)

4. SAME—REFORMATION OF APPLICANT.—While the fact that in the past the applicant for saloon license has offended the laws habitually will not prevent his having a character within the requirements of the statute, it is not sufficient for him to show he is not violating the law at the time he applied for license, but he must produce evidence of a real reformation. (Page 372.)

5. SAME—DISCRETION OF COURT TO GRANT LICENSE.—The grant or refusal
   of a license to sell liquors is discretionary, within certain limits, in
   the county court, and such discretion is reviewable on appeal.
   (Page 373.)

Appeal from Pulaski Circuit Court.

EDWARD W. WINFIELD, Judge.

Reversed.

In January, 1904, R. A. Furth applied to the county court
for license to sell liquors. A. A. Whissen and others filed a writ-
ten protest, alleging (1) that applicant was not a person of good
moral character, and (2) that during the year 1903 he kept a
gambling room in connection with his dramshop. A license was
granted to applicant, and Whissen and others appealed to the
circuit court.

On the trial the circuit clerk produced from the records an
affidavit of H. L. Yarborough charging that certain gambling
devices, known as roulette, crap tables, faro bank and others were
kept on the second floor at No. 109 Main street, over applicant's
saloon, in Little Rock. A writ was issued in June, 1903, ordering
the sheriff to seize these devices and to notify the person in pos-
session to appear and show cause why they should not be burned.
It appeared from the record that Furth intervened and claimed
the property. Judgment was rendered against Furth, from which
he appealed. A history of this proceeding will be found in *Furth
v. State,* 72 Ark. 161, 78 S. W. 759. A similar proceeding was
instituted in October, 1903. The deputy sheriff who executed
the second writ of seizure testified to having found gambling
devices the second time over applicant's saloon, and that he was
told that the stuff belonged to Furth.

Furth testified in his own behalf that gambling stopped in
his place of business in June, 1903. There was a second seizure
of some goods there in October following. There had been no
gambling there since that except a poker room for a short time.
"I did not run the gambling house personally. The city sent over
every week and got $25. At one time they collected $50 a week,
but the houses could not stand that, so they reduced it to $25. The
county came two or three times a year, and got $41. Finally, this

raid was made, and the city notified us it would raid us, and we opened no more. That was in October. We ran some between June and October, 1903. We paid our fines up till the October raid. The county fines were collected through deputy constables. No arrangements were made with the sheriff. The fines were not collected through the courts. We never went to court. They simply came and collected them, which we understood permitted us to run a gambling house. I think we ran right on between June and October. The reason we closed then was they raided us, and the police said they would raid us. We operated this business, and paid the city and county fines demanded of us. When they refused to receive fines, and ordered us to stop, we stopped, I do not know where the fines went. I had several conferences with the mayor and chief of police, and they agreed the fines would be $25 per week. It was a fine. I did not think I was doing something nobody else could do, but thought it was something contrary to law which everybody could do."

Remonstrants asked the trial court to declare that the burden of proof was upon R. A. Furth to show that he had the qualifications required by the statute. The court refused to make such declaration, but decided that the burden of proof was upon the remonstrants to show the lack of qualifications in said Furth.

The court made the following finding:

"The court finds that the applicant, R. A. Furth, kept a gambling house in the city of Little Rock, and paid into the city a fine of $25 a week. This was a general practice; any one could run gambling who paid $25 a week. Many others were engaged in it. The practice was general and of long duration. It does not appear that Furth had anything to do with inaugurating this practice. During 1903 he was twice raided, and his property burned by order of the circuit court. He was notified to close by the police of the city, and told that the arrangement was at an end, and that he would be raided if he did not. He closed. He was not operating a gambling house at the time he applied for a license, and has not since. The county court did not abuse its discretion in granting Furth license. It determined that he had a good moral character. Its decision is affirmed."

From the judgment of the circuit court Whissen and others have appealed.

*George W. Murphy* and *W. E. Atkinson,* for appellants.

The keeping of gambling devices is criminal. Sand. & H. Dig. § § 1613, 1904, 4870, 4869. No one is entitled to license unless he can show that he possesses the statutory qualifications. 60 Ark. 520; Black, Intox. Liq. § § 162, 168; 17 Am. & Eng. Enc. Law, 252. The right of citizens to appear and contest the granting of a saloon license is recognized. 61 Ark. 247; 40 Ark. 290; 51 Ark. 163; 48 N. J. L. 118; 46 N. J. L. 87; 41 N. J. L. 332.

*Fulk, Fulk & Fulk,* for appellee.

Appellants had no right of appeal. 14 Ind. 123; 37 Minn. 362; 78 Ala. 538; 45 Ind. 501; 47 N. C. 288; 60 Minn. 510; 9 N. Y. (Sup. Ct.) 618; 27 N. C. 315; 114 Pa. 452; 134 Pa. 551; 11 Grat. 655; 22 Grat. 454.

HILL, C. J. The appellee, R. A. Furth, petitioned the county court of Pulaski County, pursuant to section 4869, Sandels & Hill's Digest, to grant him a license to sell liquor during the year 1904. The appellants filed remonstrance against license issuing to him on the ground, *inter alia,* that he was not a person of good moral character. They became parties to the proceeding, adduced their evidence, and, upon an adverse decision, appealed to the circuit court, where they were again defeated, and they brought the case here. It has been advanced as one of public importance affecting the administration and construction of the liquor laws.

1. A preliminary question of practice arises. It is insisted that appellants had no right to appear in the county court. as remonstrants, no right to appeal therefrom, and no right to trial *de novo* in circuit court. There is no express statutory authority for this proceeding, but it is clearly within the general terms of the statute and its spirit and intent. The right of citizens, on behalf of themselves and the public generally, to make themselves parties to proceedings of a public nature touching the local concerns of the county has been repeatedly recognized and enforced by this court. The right of appeal is guarantied to any party aggrieved, and it may be exercised by the losing party in these proceedings. The cases of *Freeman* v. *Lazarus,* 61 Ark. 247, and *McCullough* v. *Blackwell,* 51 Ark. 159, have settled all questions raised here on this matter of practice.

2. The circuit court held the burden of proof was upon the remonstrants to prove that the applicant was not a man of

good moral character. This was error. The applicant comes to the county court alleging that license may be granted at the place sought, and that he possesses the statutory qualifications of age and character; the remonstrants may deny either or both allega-tions; and then, like all other issues of fact, the burden rests on him who asserts them. He has no natural right to license to sell liquor. This right can only be acquired by coming within all the provisions of the statute, and one of these provisions is that he must be a person of good moral character. The authorities are uniform in holding that the applicant for liquor license must show that he possesses the character and fitness required by the statute, and in the event of contest on the subject that the burden of proof is upon him. Black on Intoxicating Liquors, § § 162 and 168; 17 Am. & Eng. Enc. Law (2d Ed.), p. 252; *Ouachita County* v. *Rolland,* 60 Ark. 516; *Goodwin* v. *Smith,* 72 Ind. 113; *Raudenbusch's Petition,* 120 Pa. St. 328.

3.    Was Furth a man of good moral character, within the meaning of the statute? The Reporter will set out the substance of the evidence.   In brief it shows: For several years he has been a saloon keeper in Little Rock, running a gambling house in con-nection with his saloon, and regularly paying fines for that privi-lege to the city and county.   These fines were collected by the officers at stated periods, not as bribes, but as fines which per-mitted him to run a gambling house; which he knew was con-trary to law, but which he thought everybody could do on the same terms he did.   In other words, the officials were licensing gambling on the terms shown in his testimony.   This system was discontinued a few months before he applied for the license in question by the city closing the gambling houses. He was twice raided, and gambling devices seized and burned, in 1903, under orders of court. He testified that he did not expect to reopen his gambling house.   In business affairs the evidence shows him to be upright and honorable, and socially he appears to be popular and highly esteemed, and there is nothing shown against his private character.

The evidence shows him to have been a continuous violator of the criminal laws for many years. That the officers condoned these violations only renders them violators of the law also, and did not change the criminality of his acts before the law, however much or little, it may have changed it in public opinion.

If such a person is entitled to license under the section quoted, then the purpose of this legislation is defeated. This court said of this section: "The object of this limitation (to persons of good moral character), in part, evidently was to aid in the prevention or suppression of the crimes and vices which are sometimes associated with or grow out of the sale of liquor. The enforcement of the laws, doubtless, could be materially aided, in the way of suppressing gaming and violations of the Sabbath and other vices, by granting license exclusively to such persons." *Ouachita County* v. *Rolland*, 60 Ark. 516. It is one of the chief aims of the liquor legislation to keep gaming away from saloons. It is a misdemeanor to permit gaming in the house, outhouse, curtilage or inclosure of a dramshop, and a conviction for so doing forfeits the license, Sand. & H. Dig. § 1904; *Brockway* v. *State*, 36 Ark. 629; *Ballentine* v. *State*, 48 Ark. 45. In addition to this penalty and forfeiture of license, the dramshop keeper must give bond conditioned to respond civilly for money lost at gaming in the dramshop or any room attached thereto under his control. Sand. & Hill's Dig. § 4870.

In view of this settled policy to keep gaming away from dramshops, it seems useless to further consider whether an habitual violator of the law in this respect shall be given license. But counsel urge that the same degree of moral character is not required of a person to conduct a saloon that is required of a superintendent of a Sunday school or a minister of the gospel, and insist that the requirement is fulfilled if the applicant has as good moral character as the other applicants. Because the standard of morality of all the applicants is low is no reason for granting license to all, but is a reason for refusing to all. Suppose all the applicants were keepers of bawdy houses, as the one in the Rolland case was, should the license be granted to all because there was no distinction in the degrees of immorality? The question answers itself. Nor will the other argument avail. The law may not expect the same degree of morality for a saloon keeper as a minister, but it does require of each an equal obedience to the law. It is thoroughly settled by authority that an habitual violator of the laws, even the laws which are only *mala prohibita* instead of *mala in se*, is not within the meaning of the statute requiring the applicant to be of "good moral character." Black on Intoxicating Liquors, § 162; *Leister's Appeal*, 11 Atl.

Rep. 387; *Hardesty* v. *Hine,* 135 Ind. 72; *Stockwell* v. *Brant,* 97 Ind. 72.

Not only does this rule apply to applicants for liquor licenses, but to others. In *Weiman* v. *Mabie,* 8 N. W. 71, it was applied to an applicant for teacher's license. In the case of In re *O.,* 42 N. W. 221, it was applied to an applicant for an attorney's license. In re *Spenser,* 22 Federal Cases, p. 921, it was applied to an applicant for naturalization. In the latter case the court said: "For instance, the law of the State prohibits gaming and the unlicensed sale of spirituous liquors. These acts thereby become immoral. But their criminality consists in their being prohibited, and not because they are deemed intrinsically wrong, *mala in se.* Now, if an applicant for naturalization, whose behavior during a period of five or more years was otherwise good, was shown to have committed during that time either of these or similar crimes, I am not prepared to say that his application ought to be denied on account of his behavior. And yet it is clear that anything like habitual gaming or (unlicensed) vending of liquors under such circumstances would constitute bad behavior, immoral behavior—and be a bar under the statute to admission to citizenship."

Thus it is seen that habitual violation of the gaming or liquor laws takes away that "good moral character" contemplated by the statute, and bars even admission to American citizenship. More is the reason to hold that it takes away the "good moral character" contemplated by this statute which seeks to place the liquor traffic in the hands of the law-abiding, and not the law-breaking, class.

Therefore it follows that an habitual violator of the law, especially the laws regulating the conduct of the liquor traffic, is not a person of "good moral character," within the meaning of the statute, no matter how honest he may be in business or clean in private life.

It is said that appellee was not violating the law at the time he applied for license, and that he did not intend to reopen his gambling rooms. The evidence shows that it was the city, and not the appellee, who reformed. The mere fact that in the past a person has offended the laws habitually will not prevent him having a character within this statute if the evidence shows a

real reformation. This fact, like all others showing good character, must be established by the applicant, and, when so done, he is then a proper person for license. This restored good moral character is not proved by a mere cessation from violations of the law induced by bench warrants and burning orders.

The granting or denying license is a discretionary matter within the limits defined in Ex parte *Levy,* 43 Ark. 61, and is a judicial discretion, not an arbitrary one, and hence is subject to review on appeal to the circuit court and to this court.

The judgment is reversed, and judgment entered here cancelling the license granted appellee and for costs.